NEW YORK CENTRAL RAILROAD COMPANY *v.* PINNELL, ADMINISTRATRIX.

[No. 16,682. Filed April 14, 1942. Rehearing denied May 26, 1942. Transfer denied September 28, 1942.]

*Walter C. Williams,* of Michigan City, and *Oscar B. Smith,* of Knox (*Sidney C. Murray* and *Marvin A. Jersild,* both of Chicago, Illinois, of counsel) for appellant.

*Robert H. Moore,* of Gary, *James P. Gleason,* of Michigan City, and *Orville W. Nichols,* of Knox, for appellee.

BEDWELL, P. J.—This was an action by the appellee, Gladys A. Pinnell, administratrix of the estate of Arleigh Pinnell, deceased, to recover damages from the appellant, The New York Central Railroad Company, lessee of the Michigan Central Railroad Company, alleged to have resulted because of the wrongful death of appellee's decedent.

The issues were formed by a second amended complaint and an answer thereto in general denial. The case was tried to a jury which rendered a verdict in favor of the appellee for $6,000. The appellant appeals from the judgment rendered thereon and has assigned as error the overruling of its motion for a new trial.

The second amended complaint of appellee alleged in substance the following facts:

That Gladys Pinnell is the duly appointed, qualified, and acting administratrix of the estate of Arleigh Pinnell; that the defendant maintains and operates a steam railroad through the City of Michigan City, Indiana, which crosses a public street thereof known as Hitchcock street; that Hitchcock street runs in a northerly and southerly direction and is intersected by the right of way maintained by the defendant which extends in an easterly and westerly direction; that on either side of Hitchcock street, immediately south of such intersection, are high banks of sand; that the traveled portion thereof, which is a gravel road, is narrow and rough, and that south of the defendant's tracks and west of Hitchcock street, and extending to within approximately ten to twenty feet of defendant's tracks, is a large sand bank and part of a sand hill through which Hitchcock street and the right of way of the railroad has been graded. That such sand bank conceals the view, of persons approaching such intersection from the south upon Hitchcock street, of trains approaching from the

west along the tracks of the defendant. That at such intersection the defendant did not maintain any flashers or signal devices whatever, warning persons of the approach of trains along said highway; but that the defendant maintained certain crossing gates at the crossing that were so maintained and operated that they could be lowered as trains approached such crossing. That because of the topography in the vicinity of such intersection and the lights from the city, persons approaching the intersection in the nighttime were unable to distinguish lights reflected from trains from other lights in that particular locality; and that there were no warning devices whatever at such intersection to warn travelers of the approach of trains.

This second amended complaint further alleged that Hitchcock street was a much traveled highway that extended from the northern portion of Michigan City to the southern portion thereof, and that at the time of the collision complained of there was in force and effect an ordinance of such city regulating the speed of trains and cars within such city. This ordinance is set forth in full. It provided that no locomotive should run on any railroad track within the limits of Michigan City at a greater speed than six miles an hour, but provided that companies complying with Section 3 of the ordinance might run a locomotive at a rate of speed not exceeding twenty-five miles an hour. Section 3 provided that the company operating a steam railroad within the corporate limits of the city should maintain at such street crossings, as might be prescribed by the mayor of such city, railroad gates to be operated from towers or by other suitable means; or, when satisfactory to the mayor, it should maintain flagmen at such crossings. It further provided that the gates were to be

operated by the railroad company from 6 o'clock a. m. to 9 o'clock p. m.

The complaint further alleged that on the 20th day of February, 1937, at approximately 1:03 a. m., the appellee's decedent was driving an automobile which approached the intersection of the railroad tracks and Hitchcock street from the south and that as he was crossing such intersection the defendant (appellant) was guilty of negligence in six separate particulars, namely:

1. Negligently causing one of its trains to run at a high and dangerous rate of speed, to wit: Sixty miles per hour, over such crossing.

2. Negligently causing one of its trains to run at a high and dangerous rate of speed, to wit, sixty miles per hour, over such crossing, notwithstanding the fact that there were no flasher signals or no signals whatsoever to warn travelers of the approach of trains.

3. Negligently running its train across such intersection without sounding any bell, blowing any whistle, or giving any signal whatsoever of its approach at a high and dangerous rate of speed of sixty miles per hour.

4. Negligently running its train across the intersection, notwithstanding the fact of obstructions and that there were no flashers or warning devices, and a rough and defective crossing, at a high and dangerous rate of speed, to wit, sixty miles per hour, and without the train crew keeping a watch for persons who might be upon or crossing said intersection.

5. Negligently failing to plank or gravel said crossing and to keep it within the level of the road, and carelessly and negligently running its train across said ungravelled, unplanked and unleveled crossing at the rate of sixty miles per hour.

6. Negligently running and operating its train over such crossing at a high and dangerous rate of speed without lowering said gates aforedescribed or giving any signal whatsoever of said trains approach.

It is further alleged that because of such acts of negligence the automobile that appellee's decedent was driving came in contact with the front part of a train of appellant, the exact part of which train is not known to appellee; and that by reason of such acts of negligence the train hit the automobile in which appellee's decedent was riding with great force, hurling it through the air and injuring him so that he died as a proximate result of such injuries, leaving surviving a widow and two minor daughters.

At the first trial of the cause the jury disagreed and aforesaid verdict was returned at the second trial. At the first trial a woman, who was an occupant of the automobile driven by appellee's decedent at the time of the collision, testified as a witness of the appellee. At the second trial she was absent, and the first claimed error relied upon by the appellant is the action of the trial court in admitting, over appellant's objections and exceptions, her former testimony. Appellant contends that the appellee failed to establish the existence of the facts that were necessary to bring such secondary evidence within the exceptions to the rule which barred its admission.

In civil cases the testimony of one witness cannot be given in evidence by another in a subsequent trial of the same case, until it is made to appear that the original witness is dead, or is insane, or otherwise so physically disabled that by the exercise of due diligence his deposition could not have been taken, or that the witness is a nonresident of the State, or that he is absent from his residence, and his whereabouts cannot, by due diligence, be ascertained; or that he has absented himself by the procurement of the opposite party. *Wabash R. Co.* v. *Miller* (1902), 158 Ind. 174, 183, 61 N. E. 1005. For rule in

criminal cases see *Wilson* v. *State* (1911), 175 Ind. 458, 93 N. E. 609.

The question here involved was whether the particular witness was absent from her residence, and whether her whereabouts could, by due diligence, have been ascertained.

The appellee introduced evidence which showed that at the time of the first trial the particular witness resided with a relative in Michigan City; that after such trial she promised an attorney for appellee that she would keep him posted as to her whereabouts, and that in the event she changed her address she would notify him of such change. After the cause was set for trial the second time a private investigator, employed by attorneys for appellee, went to the residence occupied by such witness at the time of the first trial and failed to find her there. He and attorney for appellee made a search for her and found the family of relatives, with whom she had lived at the time of the first trial, then living at a new address. These people informed them that such witness had left there and gone to somewhere in Gary and from there somewhere into Illinois, and that they did not know her address or where it could be obtained. The attorney for appellee at that time had a subpoena with him and money to tender her witness fee. He made inquiries of the chief of police in Gary in an effort to locate such witness and the private investigator made a search in Gary. The private investigator was unable to get any trace of such witness.

Under such evidence, which was not contradicted, we believe the lower court was warranted in concluding that the witness was absent from her residence, and by the exercise of reasonable diligence her whereabouts could not be ascertained. The ad-

mission, at the second trial, of the evidence of such witness, under the circumstances and facts shown here, was within the sound legal discretion of the trial court; but in the event the trial court abused such discretion, the question of its abuse was one which might be reviewed and determined by this court on appeal. *Wilson* v. *State* (1911), 175 Ind. 458, 466, 93 N. E. 609; *Pine Bluff Co.* v. *Bobbitt* (1927), 174 Ark. 41, 294 S. W. 1002; *Schwalbe* v. *Postle* (1926), 80 Colo. 1, 249 P. 495; *Herndon* v. *Chamberlain* (1929), 39 Ga. App. 207, 146 S. E. 503; *Bielski* v. *Rising* (1932), 163 Md. 492, 163 A. 207; *Welp* v. *Bogy* (1925), 218 Mo. App. 414, 277 S. W. 600.

In the case of *Langnes* v. *Green* (1931), 282 U. S. 531, 541, 51 S. Ct. 243, 247, 75 L. Ed. 520, 526, the Supreme Court of the United States uses the following language in defining "discretion":

"The term 'discretion' denotes the absence of a hard and fast rule. *The Styria* v. *Morgan,* 186 U. S. 1, 9. When invoked as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result."

Appellant contends that the evidence introduced by the appellee as preliminary, and to establish the foundation for the admission of the former evidence of the absent witness, was largely hearsay, and that therefore it could not be considered in determining whether the appellee exercised due diligence to ascertain the whereabouts of such witness. It is true that the attorney and private investigator testified concerning the inquiries they made to ascertain the whereabouts of the witness and the answers that they re-

ceived to such inquiries. Although this has some superficial resemblance to hearsay, it is original and primary evidence bearing upon the point at issue, which is the diligence of the party seeking the witness. *Commonwealth* v. *Gallo* (1931), 275 Mass. 320, 175 N. E. 718, 79 A. L. R. 1380; Wigmore on Evidence (3d Ed.), Vol. 5, § 1414, p. 189.

For other cases, both civil and criminal, in this jurisdiction, which discuss the preliminary proof in connection with the introduction at a second or subsequent trial of the testimony formerly given by an absent witness, we call attention to the following: *Iowa Life Ins. Co.* v. *Haughton* (1910), 46 Ind. App. 467, 480, 87 N. E. 702; *Rooker* v. *Parsley* (1880), 72 Ind. 497; *Schearer* v. *Harber* (1871), 36 Ind. 536, 541; *Levi* v. *State* (1914), 182 Ind. 188, 191, 104 N. E. 765, Ann. Cas. 1917A 654; *Zimmerman* v. *State* (1921), 190 Ind. 537, 130 N. E. 235; *Hamilton* v. *State* (1934), 207 Ind. 97, 190 N. E. 870.

Appellant next attacks the sufficiency of the evidence to sustain the verdict of the jury and contends that there was no substantial evidence that appellant was guilty of any act of negligence which proximately caused the injury and death of appellee's decedent.

It will be noted from the allegations of the amended complaint, heretofore set forth, that the speed of the train alone, or in combination with other alleged acts or failures to act, forms the basis of each of the charges of negligence. The evidence was undisputed that appellant's train was being operated at a speed that was greater than that permitted by the provisions of the city ordinance as it approached and crossed the intersection in question. The appellant answered interrogatories to the effect that the train was traveling at a speed of approximately forty to fifty miles per hour at

the time it approached, and also at the time it crossed the intersection. All the evidence concerning the speed of appellant's train came from appellant, or its employees, while testifying as witnesses. The engineer who was in charge of the locomotive admitted that the train might have approached the intersection at a speed of fifty to sixty miles per hour. The parties stipulated that the city ordinance was in full force and effect and that the speed limitation of twenty-five miles per hour within the corporate limits of Michigan City was applicable.

The operation of such train at such a speed in violation of the terms of the city ordinance was negligence *per se*. *Shirk, By Next Friend,* v. *Wabash Railroad Company* (1896), 14 Ind. App. 126, 42 N. E. 656; *Pittsburg, etc., R. Co.* v. *Broderick* (1914), 56 Ind. App. 58, 67, 102 N. E. 887; *Cleveland, etc., R. Co.* v. *Pace* (1913), 179 Ind. 415, 423, 101 N. E. 479; *Baltimore & Ohio R. Co.* v. *Reyher, Admrx.* (1939), 216 Ind. 545, pt. 13 on p. 554, 24 N. E. (2d) 284.

There was evidence that the west corporate boundary line of Michigan City was "about a mile or so" west of the intersection where the collision occurred, and if the appellant had operated its locomotive within the corporate limits of such city at a speed of twenty-five miles or less, the jury could have determined from the evidence that at the particular time that appellee's decedent reached this crossing, the train of appellant would have been located one-half mile or more southwest therefrom and no collision would have occurred.

The evidence was ample to justify the jury in determining that the operation by appellant of its locomotive at an unlawful rate of speed was the proximate cause of the injury and death of appellee's decedent. *Wamsley* v. *Cleveland, etc., R. Co.* (1908),

41 Ind. App. 147, 149, 82 N. E. 490, 83 N. E. 640; *Chesapeake, etc., R. Co.* v. *Perry* (1918), 66 Ind. App. 532, 118 N. E. 548; *Michigan Central R. Co.* v. *Kosmowski* (1919), 70 Ind. App. 145, 153, 121 N. E. 665; *Copithorn* v. *Boston & Maine Railroad* (1938), 301 Mass. 510, 17 N. E. (2d) 713.

The only other contention of appellant is that the verdict of the jury was not sustained by sufficient evidence because the evidence conclusively showed that appellee's decedent was guilty of contributory negligence as a matter of law.

Appellant contends that the circumstantial evidence showed that the automobile collided with the train after it was some one hundred twenty-five feet over the crossing. Appellant is relying upon the following decisions of this and the Supreme Court: *C. C. C. & St. L. Ry. Co.* v. *Gillespie* (1933), 96 Ind. App. 535, 550, 173 N. E. 708; *Pennsylvania Railroad Co.* v. *Huss* (1933), 96 Ind. App. 71, 81, 180 N. E. 919, 923; *Morley* v. *C., C., C. & St. L. R. R. Co.* (1935), 100 Ind. App. 515, 529, 194 N. E. 806, 810; *New York Central R. R. Co.* v. *Casey* (1938), 214 Ind. 464, 470, 471, 14 N. E. (2d) 714, 715.

The first two of such cases were criticized in *Opple* v. *Ray* (1935), 208 Ind. 450, 457, 458, 195 N. E. 81, 84. The court there pointed out that both cases involved the collision of an automobile with a freight train standing upon a railroad crossing in the dark. It said:

"In both cases it was held that to drive an automobile at such a speed that it could not be stopped within the distance that objects could be seen ahead of it was contributory negligence as a matter of law, and that the question of proximate cause is not properly submitted to the jury. Many cases from many jurisdictions are cited to support the proposition, but it seems to us that the statement is too broad. . . . No negligence on the part of the railroad company was shown in either of the

cases, and there was no basis for recovery in any event."

In the case of *Morley* v. *C., C., C. & St. L. R. R. Co., supra,* the facts alleged showed that the driver of the automobile in which the plaintiff was riding approached an intersection upon which there was located a train of passing freight cars, and that because of the speed at which the driver of the automobile was approaching and a cloud of smoke or fog, such driver was unable to stop his automobile without colliding with the passing cars. It was there held that the alleged negligent acts of the defendant were not a concurring proximate cause of the injury of the plaintiff.

In the case of *New York Central R. Co.* v. *Casey, supra,* the Supreme Court reviews the first three of the cases cited by appellant, and calls attention to the fact that they,

"were all actions in which damages were sought for injuries received while riding in an automobile that was driven into and collided with a train standing upon or moving across a highway. . . . It was held in those cases that the train upon the track was not the proximate cause of the injury, and that the railroad company had not violated any duty by failure to provide a watchman or other special notice that the track was occupied."

The court, on p. 471, further says:

"Those who use the highways must take notice of such signs, and so regulate their speed that they may look and see for themselves whether a train is occupying a crossing ahead of them, just as they must look and see a stop sign on the highway indicating a preferential highway ahead.

". . . It may be true that many automobiles are driven into the sides of trains, but it has yet to be demonstrated that automobiles driven in a reasonably prudent manner are driven into the sides of trains upon crossings, and that such con-

duct is so usual and probable as to be reasonably anticipated. The motorist, as well as the railroad company, is required to use reasonable care. The responsibility of one is not greater than that of the other."

We believe that a close analysis of each of the particular cases will disclose that under the facts there being considered by the court, the train was standing upon the tracks at the intersection or was moving over the intersection as the motorist approached, and that he had an opportunity to discover the presence of the train on the intersection before he got so close thereto that a collision was inevitable. None of such cases hold or intimate that the rights of the motorist, or the persons occupying his car, and of the railroad company, are to be determined solely upon the basis of whether the automobile or the railroad locomotive was first upon the intersection. This would be unreasonable. An automobile and a locomotive might approach a crossing intersection so that each would arrive at the same time. If the motorist realizing the danger, placed his foot upon the brake and thereby caused the automobile to come in contact with the train instead of the locomotive striking the automobile, no one could reasonably say that such fact should be determinative of the rights to recover. Likewise, if the operator of the locomotive should discover the approach of the motorist, and should apply the brakes on the locomotive and slow the speed thereof so that the automobile was on the intersection first, that fact should not be determinative of the rights of the parties. We want to emphasize that each case must be determined not on the basis of whether the locomotive struck the automobile or the automobile struck the locomotive or the train, but upon the basis of whether, under all the

facts, conditions, and circumstances there existing, there was negligence authorizing recovery or contributory negligence preventing recovery.

The only testimony by an eye witness of what happened just before the collision was given by a woman who was riding in the automobile driven by appellee's decedent. She testified that she was riding in the rear seat of the automobile and was looking through the windshield, but that she never saw the train of appellant as they approached the crossing; that the only thing she ever saw was a flash of light and that then she was rendered unconscious by the collision. From this testimony the jury could have drawn the inference that the automobile arrived at the particular intersection before the locomotive. Such witness further testified that the night was misty and foggy and that the mist was so heavy that they couldn't see much; that they were traveling in the automobile at from twenty to twenty-five miles an hour; that it was about one o'clock at night and that appellee's decedent was driving; that he was looking straight ahead, but that he glanced up and down each intersecting road; that they were not talking; that the driver of the automobile had his window down four or five inches at his left, but because of the misty and foggy condition of the weather she was unable to see the railroad signs as they approached the intersection. She further testified that she heard no whistle from the locomotive, no ringing of its bell, or no signal of any nature; that the only warning of any kind was the flash of light just before the collision. Her testimony and the testimony of a witness who arrived at the crossing just after the collision showed that the railroad gates that were installed at the crossing were up and that they had not been lowered for the passage of appellant's train.

Appellant makes no contention that these gates were operated at this hour at this crossing. When the gates were operated prior to the collision, they were operated from a tower constructed of wood about thirty feet high and located eight or ten feet south of the south rail of the railroad and about twenty feet east of the east edge of the pavement of Hitchcock street. The southeast gate operated on a post which photographs show to be located closer to the east edge of Hitchcock street and closer to the south rail of the railroad than was such tower. After the collision, the automobile driven by appellee's decedent was headed toward the east, parallel with the track, and just east of the foundation of the tower which had collapsed toward the east and upon the back part of the automobile. There is no evidence of any injury to the post, or the gate attached thereto, that would have been between the tower and the automobile driven by appellee's decedent if the automobile had come in contact with appellant's train while it was moving over the crossing; and appellee urges from these circumstances that it was necessary for her decedent's automobile to be upon the rails in the intersection and to be struck and carried or hurled by appellant's locomotive into or against the tower in order to cause it to collapse without damaging the gate or the post to which the gate was attached. Beginning about one hundred twenty-five feet from the front of the train, which consisted of seven passenger coaches and a locomotive, there were marks of injury along the remainder of the south side of the entire train as though some object had scraped against such part of the train—grab bars on coaches were broken and some lights in the coaches were broken. Appellant contends that this physical evidence indicated that the automobile came in collision with the train at a point

about one hundred twenty-five feet from the front of the locomotive, while appellee contends that the marks upon the train were caused by the collapsed tower, or some part thereof, scraping the side of the train after the automobile of appellee's decedent had been hurled against the same so that it collapsed. The collapsed tower was so close to the tracks that it had to be removed before the next train could pass safely.

From the circumstantial evidence, and from physical facts, conflicting inferences could be drawn. One inference would be that the automobile was struck while it was on or between the rails in the intersection. The other inference is that the automobile had come in contact with the train while it was crossing at the intersection. It is not within the province of this court, upon appeal, to weigh conflicting inferences, and to speculate or try to determine just how the collision occurred. The inquiry here is not whether the jury, under the evidence, was right or wrong, but whether the verdict of the jury had support in the evidence.

The temptation is great for the judges of an appellate court to look at the photographs, maps and plats, to make computation based upon the evidence of the speed of the motor vehicle and the locomotive, to accept as true the evidence of particular witnesses as to the location of objects, and other physical facts connected with the collision, and then to try to determine how the accident happened and who was negligent. When such is done precedents lose their value, uncertainty is fostered, and nothing beneficial is added to the administration of justice. As was said by Judge Roby of this court in *Cochran* v. *Town of Shirley* (1909), 43 Ind. App. 453, 456, 87 N. E. 993, and quoted with approval and commendation by the Supreme Court in *Baltimore*

*& Ohio R. Co.* v. *Reyher, Admrx.* (1940), 216 Ind. 545, 553, 24 N. E. (2d) 284:

"'A court of appeals does not properly assume the attitude which alone becomes the trial judge and the jury. If it did this, the main purpose in the creation of such tribunals would be thwarted. There would be as much diversity between different judges and different courts on appeal as there is between different juries and trial judges, with the result that no lawyer could tell the law of a particular case until the impression of the last judge as to its facts had been obtained; and in the different results announced upon the facts of a similar character there would speedily be found such a variety of precedents as to create uncertainty in that which the interests of the state and its citizens require to be certain.'"

Where, as here, different inferences might reasonably be drawn concerning how the collision occurred and whether appellee's decedent was guilty of contributory negligence which proximately caused his injury and death, it is not for this court to determine such matter. Those were matters properly to be determined by the jury.

Appellant having pointed out no reversible error the judgment is affirmed.

NOTE.—Reported in 40 N. E. (2d) 988.